**LEGAL AID FOUNDATION OF LOS ANGELES**
Paul J. Estuar (SBN 167764) pestuar@lafla.org
Shayla Myers (SBN 264054) smyers@lafla.org
Anna Levine-Gronningsater (SBN 286341) alevine@lafla.org
7000 S. Broadway
Los Angeles, CA 90003
Tel:  (213) 640-3835
Fax:  (213) 640-3988
alevine@lafla.org

Attorneys for Plaintiff and Relator CHRISTOPHER HARRISON

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHRISTOPHER HARRISON, <br><br> and <br><br> CHRISTOPHER HARRISON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SHU-HWA BARAN, individually and as Trustee of the Shu-Hwa Baran Trust, <br><br> Defendants. | Case No. CV 14-2639 RGK-AJWx <br><br> **FIRST AMENDED COMPLAINT OF QUI TAM PLAINTIFF CHRISTOPHER HARRISON AND PLAINTIFF CHRISTOPHER HARRISON** <br><br> 1. VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. § 3729 *et seq.*) <br><br> 2. RETALIATION (California Civil Code § 1942.5) <br><br> 3. INTENTIONAL INFLICTION OF EMOTIONAL DISTRES |

1
FIRST AMENDED COMPLAINT

**PRELIMINARY STATEMENT**

1. This is a *qui tam* action by Plaintiff and Relator Christopher Harrison individually and on behalf of the United States of America. This action is brought under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Mr. Harrison brings this action to address Defendant's wrongful and illegal conduct associated with the rental of property pursuant to the Section 8 Tenant Based Housing Choice Voucher Program ("Section 8 Program").

2. The Section 8 Program is the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market. Under the Section 8 Program, tenants pay 30-40% of their income to rent a dwelling from a private landlord, and the government pays the remaining portion of the total rent to the landlord.

3. The waiting list for a Section 8 voucher in cities like Los Angeles, where market rent is exceptionally high, is rarely open. Tenants who are lucky enough to get on the waiting list are on it for years, even decades, before obtaining a Section 8 voucher. Once tenants have a Section 8 voucher, they have to find a landlord who is willing to accept it.

4. If a landlord agrees to rent to a tenant on Section 8, the landlord signs a contract certifying that the landlord will not demand any additional rent from the tenant other than the rent provided for in the contract.

5. Despite this explicit prohibition, Defendant landlord Shu-Hwa Baran took advantage of vulnerable and desperate tenants in her buildings by charging side rental payments to accept the Section 8 voucher. Defendant's actions took advantage of these tenants who made the side payments because they are still paying less rent than they would without the voucher. The side payments not only defeated the purpose of the Section 8 Program, which is to provide affordable housing with rents constituting 30-40% of each tenant's income, but also constituted fraud against the United States government, which paid the subsidies based on Defendant's representation that she would not demand or accept any additional rent.

6. When Relator and Plaintiff Christopher Harrison blew the whistle on these

illegal payments, Defendant harassed him and threatened him with eviction. He now brings this case on behalf of the United States and himself and seeks all remedies available under the False Claims Act, in addition to costs and reasonable attorney's fees and damages for retaliation and intentional infliction of emotional distress.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732.

8.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal law claims.

9.  This Court has jurisdiction over Defendant under 31 U.S.C. § 3732(a).

10. The acts and omissions complained of herein took place within the Central District of California. Defendant resides in the Central District. Therefore, venue lies in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

## PARTIES

11. Relator and Plaintiff Christopher Harrison is an individual who, at all times relevant to this complaint, resided in Los Angeles County. Mr. Harrison is a 56-year-old disabled United States veteran who has lived in his current apartment owned by Defendant since approximately October 1, 2009.

12. Plaintiff United States of America is *ex rel.* Christopher Harrison.

13. Defendant Shu-Hwa Baran is an individual and a resident of Los Angeles County, California. On information and belief, Shu-Hwa Baran at all relevant times has exercised real or apparent authority regarding Mr. Harrison's apartment, and has been responsible for following all relevant laws, but has failed and refused to do so.

14. On information and belief, Shu-Hwa Baran is the trustee of the Shu-Hwa Baran Trust. The Shu-Hwa Baran Trust has owned the subject premises at all relevant times and has exercised real or apparent authority regarding it, and has been responsible for following all relevant laws, but has failed and refused to do so.

15. This case is brought against Shu-Hwa Baran individually and as Trustee of the Shu-Hwa Baran Trust.

## STATEMENT OF FACTS

The Section 8 Program

16. The Section 8 Program is authorized by Section 8 of the U.S. Housing Act of 1938, 42 U.S.C. § 1437f, and governed by regulations contained in 24 C.F.R. 982 *et seq*. Under the Section 8 Program, the United States Department of Housing and Urban Development ("HUD") enters into annual contributions contracts with public housing agencies. Under these contracts, HUD provides funds to the public housing agencies that are used as rent subsidies to pay landlords who rent to tenants with Section 8 vouchers.

17. HUD sets and publishes standards for rent and utilities for Section 8 Program vouchers, which are based on family size. Based on market rents in their geographic area, public housing agencies inform Section 8 voucher holders the maximum total rent that will be approved. Tenants then look for private housing available for the approved rent amount.

18. Landlords who agree to rent to Section 8 tenants then enter into a proposed lease agreement with the tenant for a specified total rent to owner. The landlord and tenant present the lease agreement to the local public housing agency for approval.

19. Under 24 C.F.R. 982.507(a)(1), a public housing agency may not approve a lease until it "determines that the initial rent to owner is a reasonable rent." Generally, public housing agencies will not approve a lease if the total rent to owner exceeds HUD's payment standards.

20. Once the public housing agency approves the lease, the provisions of the lease become binding on both the landlord and tenant. The public housing agency then enters into a separate Housing Assistance Payments Contract ("HAP Contract") with the landlord. The HAP Contract is a standard and uniform contract promulgated by HUD.

21. The HAP Contract establishes the initial term of the lease, the total rent to

owner, the tenant's portion of the rent, and the amount of the housing subsidy that the public housing agency will pay to the landlord. Generally, tenants' portion of the rent is 30% to 40% of their adjusted monthly income, while the housing subsidy covers the remaining balance of the total rent to owner.

22. Pursuant to 24 C.F.R. 982.451(4)(i), "[t]he part of the rent to owner which is paid by the tenant may not be more than: (A) The rent to owner; minus (B) the PHA [public housing agency] housing assistance payment to owner." 24 C.F.R. 982.451(4)(ii) mandates that "[t]he owner may not demand or accept any rent payment form the tenant in excess of this maximum, and must immediately return any excess payment to the tenant." The HAP Contract also explicitly states that the tenant's portion of rent and the HAP subsidy may not exceed the total rent to owner, that the landlord may not accept any payments over the total rent to owner, and that the landlord must return any excess payments immediately to the tenant.

23. Pursuant to 24 C.F.R. § 982.507, the public housing agency must redetermine the reasonable rent before any increase in the total rent to owner. The HAP Contract also explicitly states that the landlord may not increase the total rent to owner without a redetermination by HACLA.

**Defendant's False Claims Under the Section 8 Program**

24. Mr. Harrison is a United States veteran who served honorably in the Navy and Navy Reserves from 1975-1981. In 1986, he suffered a spinal cord injury. The injury severely restricted the use of his legs, and he frequently must use the assistance of a wheelchair.

25. Since his spinal cord injury, Mr. Harrison has had to rely on Social Security Disability Insurance ("SSDI") for most of his income. He receives approximately $1,100.00 monthly from SSDI, and works part-time at his parents' local electronics repair shop, where he earns approximately $400.00 monthly. After his injury, he moved around between his parents' house, a mobile home, and hotels.

26. In 1996, Mr. Harrison applied to receive housing assistance from the Section 8 Program and was placed on a waiting list for the next available voucher.

5
FIRST AMENDED COMPLAINT

After waiting nearly ten years, Mr. Harrison finally obtained a Section 8 voucher in September 2006, which was administered through the local public housing agency, the Housing Authority of the City of Los Angeles ("HACLA").

27. When he obtained his Section 8 voucher, Mr. Harrison initially rented an apartment from Defendant at 1527 South Beacon Street in San Pedro, California. The total rent to owner according to the HAP Contract was $1050.00.

28. Mr. Harrison had to walk up three flights of stairs to get from the garage to his apartment because there was no elevator and no wheelchair ramp.

29. In 2008, Mr. Harrison's doctor told him that he could no longer keep living at his current apartment because of the stairs. Mr. Harrison told Defendant that he needed to move in order to avoid the stairs. Defendant told him that she owned another apartment building close by that had fewer stairs, but there were no vacancies.

30. Mr. Harrison spent the next six to twelve months looking for an available apartment in San Pedro that would accommodate his disability and that would accept his Section 8 voucher.

31. In the summer of 2009, Defendant told him that there was finally an apartment available in her other building. Defendant agreed to continue accepting Section 8; however, Defendant demanded that Mr. Harrison pay extra rent directly to Defendant. These side rent payments were in contravention of the provisions of the HAP Contract.

32. In September 2009, Mr. Harrison and Defendant signed a lease for the new apartment, located at 3623 Stephen M. White Drive, San Pedro, California, 90731. Although Defendant informed Mr. Harrison that he would have to pay more for this apartment than the last, the written lease stated that the rent would be $1,050.00.

33. HACLA approved this lease, and pursuant to HUD regulations, Defendant entered into the HAP Contract with HACLA. The HAP Contract established the total rent to owner as $1,050.00. It designated Mr. Harrison's portion of rent as $370.00 and the HAP subsidy as the remaining $680.00.

34. In the HAP Contract, Defendant promised not to accept extra rent payment

from Mr. Harrison and not to collect total rent in excess of $1,050.00. The HAP Contract included a provision stating that HACLA's payment of the HAP subsidy to Defendant was conditioned on Defendant's compliance with the HAP Contract.

35. Between October 2009 and September 2013, Defendant demanded and received thousands of dollars in illegal side rent payments from Mr. Harrison. Defendant also collected the full amount of the HAP subsidy from HACLA every month, without informing HACLA that she was charging Mr. Harrison extra rent.

36. HACLA never authorized Defendant to raise the rent, nor did it increase the total rent to owner. While Mr. Harrison's portion of the rent and the HAP subsidy fluctuated through the years based on changes to his income, the total rent to owner remained $1,050.00.

37. Throughout Mr. Harrison's tenancy at the premises, HACLA had an annual contribution contract with HUD. Pursuant to this contract, HUD provided money to HACLA to pay the HAP subsidy to Defendant.

38. The extra rent payments resulted in severe financial hardship for Mr. Harrison, and ultimately he turned to HACLA for advice. In the summer of 2013, his HACLA case worker told him that it was unlawful for Defendant to charge him extra rent. At the advice of his HACLA case worker, Mr. Harrison started paying Defendant only the amount designated by HACLA as his portion of the rent, beginning in September 2013.

39. Mr. Harrison attempted to pay September 2013 rent as he usually did, by putting the check in the door of one of Defendant's apartments. Defendant refused to accept the rent check and returned it by slipping it under Mr. Harrison's door. Mr. Harrison then mailed the rent check to Defendant via certified mail, and it was cashed.

40. On or around September 19, 2013, Defendant executed a 90-Day Notice to Quit and caused it to be served on Mr. Harrison. The notice demanded that Mr. Harrison move out of his home within 90 days and stated "THIS NOTICE, under the provisions of Section 1945 of the California Civil Code, requires no specified reason."

41. On or around October 22, 2013, Defendant's counsel mailed another notice to Mr. Harrison. This one was entitled "90-Day Notice of Termination and Non-Renewal of Section 8 Contract" and purported to cancel the Section 8 Contract and raise Mr. Harrison's rent. The Notice of Non-Renewal stated that within 90 days, Mr. Harrison "will be responsible for the FULL MONTHLY RENT."

42. On or around November 2, 2013, Defendant left multiple voicemail messages on Mr. Harrison's answering machine. The messages consisted of aggressive and abusive language, including profanity, regarding Mr. Harrison's tenancy.

## FIRST CAUSE OF ACTION
## VIOLATION OF FALSE CLAIMS ACT
## (31 U.S.C. § 3729 *et seq.*)

(By Plaintiff United States of America Against Defendants)

43. Plaintiff incorporates by reference the allegations of paragraphs 1 through 42 above, as if each such allegation were set forth in full herein.

44. The False Claims Act, 31 U.S.C. § 3729 *et seq.*, imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). Such person is liable to the United States for not less than $5,500.00 and not more than $11,000.00 per claim, plus three times the damages suffered by the United States as a result of such person's actions. *Id.* and 28 C.F.R. 85.3(a)(9).

45. Defendant certified in Provision 5(e) of the Tenancy Addendum to the HAP Contract that, "[t]he owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner." Provision 4(a) prohibits the landlord from increasing rent above the total rent to owner without written authorization from the PHA. Provision 5(f) states that the owner "must immediately return any excess rent payment to the tenant." Under the

HAP Contract, Defendant explicitly agreed to comply with the provisions of the HAP Contract in order to collect the HAP subsidy from HACLA. Provision 7(b) of the HAP Contract states, "Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract." Provision 10(c) of the HAP Contract states that HACLA's rights and remedies for owner breach of the HAP Contract include "recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract."

46. Provision 8(d) of the HAP Contract states, "During the term of this contract, the owner certifies that…except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term."

47. Defendant has collected the HAP subsidy from HACLA for the subject premises every month since October 2009, even though Defendant was not in compliance with the HAP Contract because she collected extra rent from Mr. Harrison and collected rent in excess of the total rent to owner.

48. On information and belief, in addition to renting to Mr. Harrison, Defendant rents apartments to numerous other tenants receiving Section 8 and charges these tenants extra rent while certifying through the HAP Contract that she is not collecting extra rent. On information and belief, Defendant collected numerous HAP subsidies from local public housing agencies, while knowingly collecting excess rent from tenants receiving Section 8.

49. Defendant knowingly made or used, or caused to be made or used, material false records or statements to get false or fraudulent claims paid or approved by officials of the United States government, in violation of 31 U.S.C. § 3729(a)(2).

9
FIRST AMENDED COMPLAINT

50. Defendant's collection of each monthly HAP subsidy check, while knowingly imposing side payments on Mr. Harrison and other tenants in excess of the total rent to owner designated by the public housing agency, constitutes a separate false claim or representation against the United States.

51. The United States suffered damages as a result of Defendant's violations of the false Claims Act because the money that HUD disbursed to the public housing agency for payment to Defendant would not have been paid to Defendant absent her false claims and misrepresentations.

52. The United States suffered damages equal to the amount of each HAP subsidy, which would not have been paid to Defendant if HACLA and/or HUD knew of her false certifications.

## SECOND CAUSE OF ACTION

### RETALIATION

**(California Civil Code § 1942.5)**

(By Plaintiff Christopher Harrison Against Defendants)

53. Plaintiff incorporates by reference the allegations of paragraphs 1 through 52 above, as if each such allegation were set forth in full herein.

54. California Civil Code § 1942.5 prohibits lessors from retaliating against lessees because of the exercise by the lessee of his or her rights.

55. Defendant has retaliated against Mr. Harrison for lawfully and peacefully exercising his legal right to stop making side payments.

56. Defendant has retaliated against Mr. Harrison by harassing him, threatening to unlawfully terminate the HAP Contract, demanding an unlawful rent increase, and threatening to unlawfully evict him without good cause.

57. A landlord may raise the rent, evict a Section 8 tenant, and terminate a HAP Contract only in accordance with HUD regulations and local rent control laws. Mr. Harrison's apartment is subject to the Los Angeles Rent Stabilization Ordinance

("LARSO"), which makes it unlawful for landlords to demand a rent increase in excess of 3% annually. LARSO also makes it unlawful for a landlord to terminate a HAP Contract without good cause, or to evict a tenant without good cause.

58. Defendant's conduct in breaching § 1942.5 has been fraudulent, malicious, and oppressive, thereby entitling Mr. Harrison to punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(By Plaintiff Christopher Harrison Against Defendants)

59. Plaintiff incorporates by reference the allegations of paragraphs 1 through 58 above, as if each such allegation was set forth in full herein.

60. Defendant's conduct as described above was so extreme that it exceeded all possible bounds of decency and was so outrageous that any reasonable person would regard it as intolerable.

61. Defendant demanded excess rent payments from Mr. Harrison, knowing that he was a participant in a housing program intended to protect vulnerable low-income tenants and that moving is difficult for him because of his income and disability.

62. Defendant also blatantly misrepresented Mr. Harrison's rights under the Section 8 Program and LARSO, which constitute the federal and local governments' attempts to protect the rights of low-income and disabled tenants.

63. When Defendant exercised his rights under the Section 8 Program and LARSO, Defendant left threatening, abusive, and profane messages on Mr. Harrison's answering machine.

64. In engaging in the conduct, Defendant intended to cause such emotional distress and/or acted with reckless disregard for the probability that Mr. Harrison would suffer emotional distress from her conduct.

65. As a direct and proximate result of the aforementioned acts, Mr. Harrison has suffered and continues to suffer substantial damages, including hardship, anxiety, and severe mental and emotional anguish.

66. Defendant's conduct has been fraudulent, malicious, and oppressive, thereby entitling each plaintiff to punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America and Mr. Harrison pray for relief as set forth hereinafter.

1. For a finding that Defendant violated the False Claims Act and is liable to the United States;
2. For a civil penalty against Defendant for each separate violation of the False Claims Act in the amount of not less than $5,500.00 and not more than $11,000.00;
3. For an award to the United States of three times the amount of damages that the United States sustained as a result of Defendant's acts;
4. For an award to Mr. Harrison of the *qui tam* plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d);
5. For an award of compensatory damages to Mr. Harrison in an amount according to proof;
6. For an award punitive and exemplary damages to Mr. Harrison in an amount necessary to punish Defendant and in an amount according to proof;
7. For an award to Mr. Harrison of statutory damages pursuant to Civil Code § 1942.5(f)(2);
8. For an award to Mr. Harrison of reasonable attorney's fees and costs; and
9. For such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action triable by jury.

Dated: January 5, 2015

LEGAL AID FOUNDATION
OF LOS ANGELES

By:    /s/ Anna Levine-Gronningsater
       Anna Levine-Gronningsater
       Attorneys for Plaintiff